UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JAMES MACCHIO,<br><br>Defendant | Criminal No. 24-10083<br><br>Violation:<br><br>Count One: Conspiracy to Commit Wire Fraud (18 U.S.C. § 1349)<br><br>Forfeiture Allegation:<br>(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)) |

INFORMATION

At all times relevant to this Information:

General Allegations

1.  The defendant, JAMES MACCHIO ("MACCHIO"), lived in Connecticut and worked at a real estate brokerage company (the "Brokerage"), where he managed a team of brokers, and represented banks and other mortgage holders in the sale of distressed residential properties.

2.  Sheldon Haag lived in Connecticut and worked for MACCHIO as a broker at the Brokerage.

3.  Co-Conspirator 1 ("CC1") lived in Connecticut and owned the Brokerage.

4.  Co-Conspirator 2 ("CC2"), Co-Conspirator 3 ("CC3), and Co-Conspirator 4 ("CC4") were straw buyers in the fraud scheme described below.  CC2 was related to Haag.

5.  CC4 Construction was a limited liability company registered in Connecticut and in Massachusetts, that falsely purported to be a construction company owned by CC4.

6.  J.P. Morgan Chase Bank, N.A. ("Chase") was a bank based in New York, the deposits of which were insured by the Federal Deposit Insurance Corporation ("FDIC").

7. U.S. Bank, N.A. ("U.S. Bank") was an FDIC-insured bank based in Ohio.

8. Select Portfolio Servicing, Inc. ("SPS") was mortgage servicing company, based in Utah, that handled short sales of properties.

## Overview of the Conspiracy

9. Beginning in or about 2015, MACCHIO conspired with Haag and others known and unknown to the U.S. Attorney to defraud banks, mortgage servicers, and other clients of the Brokerage by purporting to act as their brokers in the sale of distressed residential real estate while secretly purchasing those properties themselves, at favorable prices, in the names of straw buyers, and later reselling them at a profit. As part of the conspiracy, MACCHIO further defrauded his clients by submitting fraudulent and inflated bids for repair work at the properties in the name of CC4 Construction and other contractors, and secretly pocketing the difference between the inflated cost his clients paid and the actual cost of the repairs. As a further part of the conspiracy, MACCHIO fraudulently applied for Paycheck Protection Program ("PPP") loans for entities, including CC4 Construction, in order to fund the operation of the wire fraud scheme.

## Object and Purposes of the Conspiracy

10. The object of the conspiracy was to commit wire fraud by, among other things, secretly purchasing distressed properties from clients of the Brokerage at below-market prices and reselling them at a profit, and overcharging clients for repair work at those properties. The principal purposes of the conspiracy were to enrich the co-conspirators and to avoid detection of the fraud scheme by clients, law enforcement, and others.

## Manner and Means of the Conspiracy

11. Among the manner and means by which MACCHIO and others known and unknown to the U.S. Attorney carried out the conspiracy were the following:

a. Recruiting straw buyers to purchase distressed properties from clients of the Brokerage, while hiding the fact that MACCHIO and Haag were the actual buyers of the properties for which they also served as the clients' real estate brokers;

b. Creating fake competitive bids to deceive clients of the Brokerage into selling properties to the straw buyers;

c. Falsely certifying that real estate transactions were "arms-length" and that there were no undisclosed business relationships among the buyers and the real estate brokers;

d. Submitting false and fraudulent bids to clients of the Brokerage from CC4 Construction and other construction companies for repairs on the properties the clients were selling; and

e. Submitting fraudulent applications for and obtaining PPP loans for business entities involved in the wire fraud scheme, and using the loan proceeds for payment of non-payroll expenses, contrary to the purposes for which the loans were supposed to be used.

<u>Acts in Furtherance of the Conspiracy and the Scheme to Defraud</u>

12. Beginning in or about 2015 and continuing through at least in or about 2021, MACCHIO and co-conspirators known and unknown to the U.S. Attorney committed and caused to be committed the following acts, among others, in furtherance of the conspiracy:

*Sale of the Stamford Property in Bankruptcy*

13. On or about November 3, 2015, MACCHIO signed an affidavit in support of an application to employ the Brokerage and MACCHIO as the brokers for the short sale of a residential property in Stamford, Connecticut (the "Stamford Property") as part of a bankruptcy

proceeding. A "short sale" is the sale of a property for less than the outstanding mortgage debt on that property. In the affidavit, MACCHIO falsely represented that he "and each member of [his] firm [was] a 'disinterested person'" and "that no member of [his] firm held or represent[ed] any interest adverse to the [bankruptcy] Estate."

14. On or about that same day, Haag emailed the signed Affidavit, which Haag notarized, to the U.S. Bankruptcy Trustee, who was selling the Stamford Property as part of the bankruptcy proceeding, subject to approval from U.S. Bank, which held a mortgage on the property in the amount of $498,500.

15. On or about November 11, 2015, CC2—acting at the direction of Haag and MACCHIO—offered to buy the Stamford Property for $350,000. The offer was rejected.

16. On or about December 9, 2015, Haag told a co-conspirator that the Stamford Property had a value of $530,000.

17. On or about February 2, 2016, CC2 signed a second contract to buy the Stamford Property for $430,000.

18. On or about May 2, 2016, after CC2's second offer had been accepted, Haag arranged for a wire transfer in the amount of $430,000 from Brookline Bank in Massachusetts to a real estate attorney in Connecticut who handled the closing.

19. On or about May 3, 2016, CC2 bought the Stamford Property for $430,000.

20. On or about August 8, 2016, CC2—acting at the direction of Haag and MACCHIO—closed on the sale of the Stamford Property to a third party for $590,000.

*Short Sale of the East Hartford Property*

21. On or about April 22, 2015, MACCHIO directed Haag to list a short-sale property in East Hartford, Connecticut (the "East Hartford Property") for their client, SPS.

22. On or about September 19, 2016, CC3, acting at MACCHIO and Haag's direction, executed a purchase and sale agreement to buy the East Hartford Property for $62,000.

23. On or about January 23, 2017, CC3 executed an affidavit falsely attesting that there were "no agreements, understandings, contracts, or offers relating to the current sale or subsequent sale of the Property that ha[d] not been disclosed" to SPS. In fact, MACCHIO, who signed the affidavit as "buyer's agent," and Haag, who signed the affidavit as "seller's agent," had agreed to pay CC3 $2,500 for acting as a straw buyer on the transaction. MACCHIO and Haag had secretly agreed to sell the property after they caused CC3 to buy it, and to split the profits.

24. On or about February 10, 2017, CC3 executed an "Affidavit of Arm's Length Transaction" required by SPS to close the short sale and falsely attested, among other things, that the sale of the East Hartford Property was "an 'arm's length' transaction, between Seller(s) and Buyer(s) who [were] unaffiliated by . . . commercial enterprise" and that there were "no hidden terms or hidden agreements or special understandings between the Seller and the Buyer or among their respective agents that [were] not reflected in the Agreement."

25. On or about July 17, 2017, acting at the direction of Haag and MACCHIO, CC3 sold the East Hartford Property for $138,000, a $76,000 premium over the purchase price.

26. Thereafter, MACCHIO caused the proceeds of the East Hartford Property sale to be disbursed to the co-conspirators, with approximately $18,000 going to Haag, approximately $29,000 going to MACCHIO, and $2,500 going to CC3.

*Sale of the Weston Property in Bankruptcy*

27. On or about November 25, 2015, MACCHIO signed an affidavit in support of an application to employ the Brokerage and MACCHIO as the real estate brokers for the sale of a property in Weston, Connecticut (the "Weston Property"). In the affidavit, which Haag notarized,

MACCHIO falsely represented that he "and each member of [his] firm [was] a 'disinterested person'" and "that no member of [his] firm held or represent[ed] any interest adverse to the Estate."

28. On or about the same day, MACCHIO executed an "Exclusive Right to Sell Agreement" with the U.S. Bankruptcy Trustee, under the terms of which MACCHIO agreed to act as the U.S. Bankruptcy Trustee's real estate broker.

29. On or about March 25, 2016, CC3, acting at the direction of Haag and MACCHIO, executed a contract with the U.S. Bankruptcy Trustee for a short sale of the Weston Property for $245,000, subject to approval of the United States Bankruptcy Court for the District of Connecticut and Chase Bank, which held the mortgage of $410,000.

30. On or about May 16, 2016, Haag, CC3, and MACCHIO signed an affidavit falsely attesting that there were "no agreements, understandings, contracts, or offers relating to the current sale or subsequent sale of the Property that have not been disclosed to the Servicer." In fact, CC3 was buying the Weston Property at the direction of MACCHIO and Haag, who planned to renovate and resell it and split the proceeds.

31. On or about June 9, 2016, CC3 bought the Weston Property for $245,000.

32. Thereafter, MACCHIO and Haag oversaw the renovation of the Weston Property.

33. On or about February 14, 2017, CC3, acting at the direction of MACCHIO and Haag, sold the Weston Property to a third party for $483,000.

*CC4 and CC4 Construction*

34. In about 2017, CC4 agreed with Haag to create a front company that Haag and MACCHIO could use to conduct real estate transactions and bid on construction projects without disclosing their involvement in the transactions, in exchange for a payment of $500 per month. In fact, CC4 was not a contractor, did not do any construction work, did not invest capital into the

company for use in operations or real estate purchases, and had no bona fide employees at CC4 Construction.   MACCHIO and Haag controlled and directed the operations of CC4 Construction.

35. On or about April 5, 2017, pursuant to the agreement with MACCHIO and Haag, CC4 registered CC4 Construction as a corporation in Massachusetts and Connecticut.

36. On a date unknown, but no later than in or about 2017, CC4 agreed to allow MACCHIO and Haag to use his identity to purchase homes for their benefit, in exchange for a payment of $2,500 to CC4 for each home purchased.

*Sale of the Staten Island Property*

37. On or about February 26, 2021, MACCHIO forwarded a listing for a property owned by the Veteran's Administration ("VA") to Haag to list for sale at a price of $487,500.

38. On or about March 5, 2021, MACCHIO instructed Haag to pretend to engage with bona fide third party buyers, writing, "Play it out a little so we can document system that we were responsive and trying to work with buyers who called in."

39. On or about March 9, 2021, a VA purchase and sale agreement for the Staten Island Property was purportedly executed by CC4.  The form contained the representation that the property was not being purchased "directly or indirectly by or for . . . any agents [or] brokers." The form listed CC1 as the principal broker and MACCHIO as the "sales person."  MACCHIO signed the VA purchase and sales agreement electronically.

40. On or about March 18, 2021, Haag applied for a loan to renovate the Staten Island Property, on which he represented that the current, "as-is" value of the property was $550,000.

41. On or about April 29, 2021, Haag transferred $12,615.62 into the CC4 Construction bank account; MACCHIO transferred $100,000 into the CC4 Construction bank account; and

$107,615.62 was wired from the CC4 Construction bank account to the closing agent for the sale of the Staten Island Property.

42. According to the HUD-1, CC4 Construction acquired the Staten Island Property on April 29, 2021.

43. Thereafter, MACCHIO and Haag oversaw the renovation of the Staten Island Property, and on or about September 21, 2021, CC4 sold the State Island Property for $659,000.

*Contractor Bid Rigging*

44. Starting no later than about May 2017 and continuing to at least about November 2020, MACCHIO and Haag submitted fake bids from contractors to their clients for renovations of properties that the Brokerage had agreed to list for sale, while awarding the actual work to contractors who charged less money. MACCHIO and Haag billed their clients based on the higher fake bids and pocketed the difference between the fake bids and the actual cost of work. Through this aspect of the fraud scheme, MACCHIO and Haag earned additional fraudulent profits of more than $1.3 million.

45. As one example, on or about November 8, 2017, MACCHIO told Haag that the Brokerage would handle the short sale of a property in Springfield, Massachusetts (the "Springfield Property") for U.S. Bank and that Haag would be the seller's broker.

46. On or about November 9 and November 10, 2017, Haag created a fake bid from CC4 Construction for work on the Springfield Property in the amount of $4,339.08 and Haag obtained a fake bid from yet another contractor for $4,650.

47. Thereafter, Haag submitted the CC4 Construction bid for $4,339.08 and the bid of $4,650 to U.S. Bank's mortgage servicer, which accepted the bid from CC4 Construction.

48. CC4 Construction invoiced U.S. Bank's mortgage servicer for the work in the amount of $4,339.08, but MACCHIO and Haag had another undisclosed contractor do the work for $2,720 and kept for themselves the $1,360 difference between CC4 Construction's fake bid and the real invoice.

49. As a second example, on or about April 7, 2020, MACCHIO told a mortgage company that a property in Brookfield, Connecticut (the "Brookfield Property"), it was listing for sale with MACCHIO was suitable for renovation and that Haag was getting bids.

50. On or about June 10, 2020, Haag sent an email to the CC4 Construction email address, which a MACCHIO employee controlled, requesting a fake CC4 Construction bid to renovate the Brookfield Property.

51. On or about June 11, 2020, Haag asked a co-conspirator to create an "overbid" for the Brookfield Property from another contractor.

52. On or about the same day, after receiving the fake "overbid," Haag asked MACCHIO to approve the CC4 Construction bid and the "overbid," and MACCHIO responded, "3k to me on this one."

53. On or about the same day, Haag sent the two bids to the mortgage company stating, "2 bids attached[.]   Recommend lower bid [CC4] $46,767.41," and the mortgage company approved the CC4 Construction bid to renovate the Brookfield Property.

54. Thereafter, CC4 Construction invoiced the mortgage company three times for a total of $46,767.41, but MACCHIO and Haag had another undisclosed contractor do the work for $29,500 and kept for themselves the difference between CC4 Construction's fake bid and the real invoice.

*PPP Loan Fraud*

55. Starting no later than in about April 2020, MACCHIO and co-conspirators applied for and received PPP loans for entities, including CC4 Construction, based on applications that falsely attested that the entities were not involved in criminal activity, falsely failed to disclose related companies, and falsely reported payroll information.

56. On or about April 6, 2020, a co-conspirator told MACCHIO that he would prepare PPP loan applications for CC4 Construction and another shell company.

57. On or about April 23, 2020, MACCHIO caused a PPP loan application for CC4 Construction, dated April 13, 2020, to be submitted to a bank from MACCHIO's company email; the loan application falsely attested that:

   a. CC4 Construction did not have common management with any other business, even though MACCHIO and his employees controlled CC4 Construction;

   b. CC4 Construction had $8,333.34 in average monthly payroll for CC4, its one employee, even though CC4 actually earned only $500 per month, plus commissions on straw buyer transactions, as the "owner" of the company; and

   c. CC4 Construction was "not engaged in any activity that is illegal under federal, state, or local law," even though CC4 Construction was an instrument of a wire fraud scheme.

58. On or about the same day, after the bank asked for payroll information for CC4 Construction, a co-conspirator emailed the bank that CC4 Construction did not have W-2 employees and that the application was based on CC4's earnings as the owner.

59.     On or about the same day, after the bank further questioned the PPP loan application from MACCHIO because he was not apparently affiliated with CC4 Construction, CC4 told the bank that he knew and approved of the application.

60.     After receiving the PPP loan of $20,832, CC4 Construction issued $4,500 in payments to CC4 and the remainder of the PPP loan to other contractors involved in flipping houses for MACCHIO.

COUNT ONE
Conspiracy to Commit Wire Fraud
(18 U.S.C. § 1349)

The United States Attorney charges:

61. The United States Attorney re-alleges and incorporates by reference paragraphs 1-60 of this Information.

62. From in about 2015 through at least in or about 2021, in the District of Massachusetts and elsewhere, the defendant,

JAMES MACCHIO,

conspired with others known and unknown to the U.S. Attorney to commit wire fraud, that is, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, did transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures and sounds, for the purpose of executing the scheme to defraud, in violation of Title 18, United States Code, Section 1343.

All in violation of Title 18, United States Code, Section 1349.

## FORFEITURE ALLEGATION
(18 U.S.C. § 981(a)(1)(C))

The United States Attorney further alleges:

63. Upon conviction of the offense in violation of Title 18, United States Code, Section 1349, set forth in Count One, the defendant,

JAMES MACCHIO,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense. The property to be forfeited includes, but is not limited to, the following asset:

    a. [Money Judgment Amount], to be entered in the form of a forfeiture money judgment.

64. If any of the property described in Paragraph 63, above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendant --

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 63 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

_____
KRISS BASIL
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF MASSACHUSETTS

*Digitally signed by KRISS BASIL*
*Date: 2024.04.08 10:33:37 -04'00'*